In the Matter of SAMUEL A. EICHNER, an Attorney, Respondent.

First Department, April 11, 1930.

*Isidor J. Kresel* of counsel [*Louis Salant* with him on the brief], for the petitioners.

*Alexander I. Rorke* of counsel [*Henry Clay Greenberg* with him on the brief; *Rorke & Kane*, attorneys], for the respondent.

DOWLING, P. J.   Respondent was admitted to practice as an attorney and counselor at law in the State of New York on October 9, 1924, at a term of the Appellate Division of the Supreme Court of the State of New York, Second Department.

The petition charges respondent with misconduct as an attorney at law as follows:

In or about the year 1926 respondent instituted or caused to be instituted in the courts of the State of New York twenty-six (26) actions to recover damages for injuries alleged to have occurred to the person and property of one Joseph or Joe Plastik, although said Plastik had not in fact sustained all of such injuries or been involved in all of such accidents, all of which facts were known to respondent; but such actions were nevertheless instituted as part of the scheme or plan on respondent's part to induce or to compel the persons named as defendants in said accidents, or the insurance companies which had previously insured said defendants against damages of the character claimed by the plaintiff therein, to pay sums of moneys to the respondent as attorney for said plaintiff in settlement of the claims; further, that in various Plastik actions respondent prepared, filed and served, or caused to be prepared, filed and served, bills of particulars which, to the knowledge of respondent, contained false and misleading statements regarding the extent and nature of the injuries alleged to have been sustained by Plastik, and false and misleading statements regarding the damages alleged to have been suffered by Plastik.

In or about the month of March, 1927, one Louis Salant was driving a taxicab which was damaged in a collision with another automobile, in which collision the said Salant suffered no personal injuries whatsoever, as respondent well knew, and that respondent nevertheless brought suit in behalf of said Salant for injuries alleged to have been sustained to his person, and instructed and persuaded said Salant upon the trial of the action to testify to the effect that he had sustained injuries to his person.

After the respondent answered, the matter was referred to a referee to take testimony in regard to the charges and to report the same with his opinion thereon to this court. The learned referee has duly reported and petitioners move that respondent be adjudged guilty of professional misconduct and for such action as the court may deem proper.

The record shows that Joseph Plastik at the beginning of the year 1926 lived at Sixteenth avenue and Forty-first street, Brooklyn; that he lived there until about the middle of the year 1926, when he moved to 790 East Second street, Brooklyn, where he lived until about the middle of the year 1927; thereafter he moved to 1718 Sixty-sixth street, Brooklyn, where he was living at the time of the hearings before the referee; that he was engaged in the business of renting autos and at the beginning of the year 1926 had his place of business at 261 East Second street, New York, and had had it there for five years previous to January 1, 1926, and remained there until about June, 1928. Plastik knew respondent before the latter practiced law. In 1926 and early in 1927 respondent represented him in a number of cases of personal injuries and property damage. Ten were based on claims for personal injuries and eight for property damage. The names of the defendants in the ten personal injury cases, together with the dates of the alleged accidents and the dates of the summons, are as follows:

| Defendants | Date of accident | Date of summons |
|---|---|---|
| Hipper | June 3, 1926 | June 10, 1926 |
| Shenkman | June 14, 1926 | June 15, 1926 |
| Decker | June 26, 1926 | July 6, 1926 |
| Mitchell | July 13, 1926 | July 20, 1926 |
| Kirchoff | Sept. 8, 1926 | Sept. 14, 1926 |
| Tessie Cohn | Sept. 20, 1926 | Sept. 23, 1926 |
| Fortier | Oct. 3, 1926 | Oct. 8, 1926 |
| Consolidated Gas Company | Oct. 4, 1926 | Oct. 15, 1926 |
| Spelman & Cohn | Nov. 1, 1926 | Nov. 9, 1926 |
| Schechtor | Nov. 12, 1926 | Nov. 16, 1926 |

Four of the alleged accidents happened between June third and July thirteenth, an average of about one every ten days. Then for a period of almost two months, between July thirteenth and September eighth, there are no claims for injuries to the person. The period of two months coincides with the time during which the courts were closed for the trial of cases. On September eighth, however, and almost as soon as the courts were reopened for trials, the claims of injury to the person were resumed and

between that date and November twelfth, a period of about two months, no less than six cases were brought for injuries to Plastik's person, thereby maintaining the pre-vacation average of about one every ten days. All of these actions were brought in the Municipal Court of the City of New York, Second District, Borough of Manhattan. Not a single one of the summonses stated Plastik's correct business address, and the address on each was different from the address in every other.

Plastik testified he had so many cases he could not remember them all. He had no recollection of the Hipper accident, did not know what had become of the action, but if it was settled he received his share of the recovery.

He had no recollection of the nature of the accident in the Shenkman case; he claimed to have been attended by Dr. Steingesser and Dr. Hartman. Forty-two dollars is specified in the bill of particulars in the Shenkman case as having been paid to Dr. Steingesser and Dr. Hartman. It was shown that he could not have spent more than eight dollars or ten dollars for the entire year for visits to these doctors. He admitted that he did not spend anything like forty-two dollars for doctors' bills in connection with that accident, and that he did not see the doctors anything like twenty-two times, as alleged, and that the bill of particulars was wholly wrong; that during 1926 the only medicines he bought were some liniments to rub on his body a few times, and that he never paid anything like nineteen dollars for liniments in connection with the Shenkman accident. He was at home and could not attend to his business for two or three days, not more than a week at the outside, and not anything like four and a half weeks. He claims to have told the correct amounts paid for doctors and medicines to some one in respondent's office, as well as the exact period of disability, and could not explain the statement in the bill that he was disabled four and a half weeks. It is alleged in the bill of particulars that he lost weekly earnings of fifty-five dollars as chauffeur. He said he never lost anything like that, never told anybody in respondent's office that he lost anything like that, and he could not explain how that statement ever got into the bill.

The bill of particulars in the Shenkman case alleged that he was disabled for four and a half weeks from June fourteenth. It is strange that while he was so disabled he should become involved in two other collisions, one, he Decker case, on June sixteenth, and the other, the Mitchell case, on July thirteenth.

The Decker accident is fixed in his mind because it happened while he was sitting in his car in front of his place of business.

The other details, such as what the injuries were, or whether he was disabled, he could not remember.

The Mitchell collision he said happened while he was driving his automobile from his home in Brooklyn to his business on Second street, Manhattan, on July thirteenth. The bill of particulars alleged contusions of the abdomen, sprain of the left wrist, sprain of the left arm, contusion of the left side, hematoma of the forehead, disablement for four and one-half weeks, doctors' bills of thirty-five dollars, and medicine bills of fourteen dollars. The only thing he could remember as to his injuries was that he was hurt in the left arm. He could not remember whether he had been disabled, or whether he went to Dr. Steingesser or Dr. Hartman. As in the Hipper case, he spent no such sum as thirty-five dollars for doctors' bills, nor fourteen dollars for medicines.

The Kirchoff case was the result of an accident alleged to have occurred on September 8, 1926. He could remember nothing as to the details of the accident or the items of damage as alleged in the bill of particulars.

The bill of particulars in the Kirchoff case and the bill of particulars in the Shenkman case (which was the result of the accident which was supposed to have occurred on June fourteenth) are strikingly similar. They are both dated September 30, 1926; the period of disability in the Shenkman case is four and one-half weeks; in the Kirchoff case it is three weeks, but it is alleged that upon the date thereof the plaintiff was still disabled and in bed; the injuries are almost identical; property damage claim is the same total; the earnings and amounts expended for doctors and medicines are similar.

He claimed he had a couple of accidents on the Williamsburg bridge, the dates of which he could not recall, nor could he remember anything about the accident in the Cohn case, which is supposed to have occurred on the Williamsburg bridge on September twentieth, when, according to the bill of particulars in the Kirchoff case, he was supposed to be disabled and in bed.

On October third, the accident leading to the Fortier case is supposed to have occurred. It was alleged that Plastik suffered personal injuries as well as considerable damage to his Cadillac automobile; he testified: " The whole back of my car was knocked in. * * * My car wasn't worth nothing; not a nickel." As to his personal injuries, he testified he was hurt " In the front, I don't know what part of my body I was hurt." He went to the doctor, but did not remember which one, nor what the doctor did for him. He did not remember how long he was disabled — " maybe it was a week, maybe it was three days and maybe two

days, I don't know how long I was disabled." He was surprised to learn for the first time before the referee that the action arising out of this supposed accident was discontinued on November 30, 1926.

Notwithstanding his claim to have been disabled as the result of the Fortier accident on October third, the very next day, October 4, 1926, is alleged as the date of a collision with a vehicle of the Consolidated Gas Company, suit for which was instituted on October fifteenth for personal injuries and property damage. Plastik remembered nothing about an accident involving a collision with a Consolidated Gas Company vehicle.

November first is the date of the accident leading to the suit against Spelman & Cohn, which was commenced November ninth. This occurred in front of his place of business, and he testified that an automobile ran into a baker's wagon and drove the baker's wagon into his automobile while he was polishing it. He remembered this incident pretty well.

November twelfth is the next accident date. Suit was commenced November sixteenth, and the summons is indorsed: " Action for personal injury sustained by plaintiff on November 12, 1926, in front of 261–2nd Street, Borough of Manhattan, City of New York." Plastik's recollection of this is that while he was working around the car a taxicab ran into him.

The record shows there were eight actions for property damage. Plastik showed his usual faulty memory as to the details of these property damage claims. Plastik was in the business of renting out cars for hire and frequently others than he would drive the cars. When applied to the property damage claims, therefore, his lapses of memory are not so unaccountable. His testimony as to the actual occurrence of any of the accidents is not convincing.

Not one of the eighteen cases was tried. Out of the settlements Plastik received about $300. The arrangement was that respondent was to receive one-third. Apparently the settlements totaled about $450.

Respondent claimed he personally had nothing to do with the bringing of the actions, or the drawing, filing and serving of the complaints and bills of particulars; his testimony is that he did the trial work exclusively for the office; he was in court every trial day trying his own or other attorneys' cases and was not able to give much personal attention to office matters regarding detail and routine. He left the entire charge of the office to his stenographer, Miss Katz; she took facts from clients, their injuries, the damages, the necessary details, commenced suits, drew summonses, complaints, and sent letters. Whatever was necessary she actually

followed up, arranged physical examinations with doctors for insurance companies, did everything but settle or try the case. Respondent testified as to Miss Katz: "At the time she came to me she said she had been working several years in law offices, and that she was very conversant with pleadings, and the manner in which an office should be run. I asked her whether she had much experience in negligence law, and she said she did. Then I asked her whether she would be able to take the burden off my shoulders, because I would have to be in court all the time, and she said she could." He testified that prior to June, 1927, when he realized his office was being run rather loosely, a case would come into his office, and a girl would draw up the summons, or summons and complaint — according to what happened — and the action ran along until it was ready for trial or settlement, and he would not know anything about it. On cross-examination he testified that a man could come in to him and say: "I had an accident on such and such a date and I was hurt," and he would turn him over to Miss Katz without any inquiry as to how the accident occurred or who was at fault, and without any instructions to Miss Katz to inquire into the merits.

Respondent testified that he instructed his stenographer to bring actions in the Second District Court, and did that for his convenience, so that he would not have to go to several different courts.

The testimony of Miss Katz (now Mrs. Field) before the referee evidences an earnest desire to shield respondent. On vital points her testimony before the referee is opposed to that which she gave on the investigation before Mr. Justice WASSERVOGEL. For instance, before Mr. Justice WASSERVOGEL she testified positively that the information on the basis of which she typed the bills of particulars in the Plastik cases was obtained from respondent; that this information in each instance was obtained from him or from the files in the case where he had written down the information; that respondent had written down the information, and she further elaborated that when a client came into the office respondent would call her into his room to take the information from them, and respondent would ask her to write it down and then type it; that no bill of particulars left the office unless it was first submitted to and examined by respondent, and that this was true in every case. Before Mr. Justice WASSERVOGEL she was asked: "Did you at any time of your own accord, simply from information furnished by a client, prepare bills of particulars of your own accord?" and the answer was: "No, never on my own accord, oh, no." On the hearings before the referee, however,

Mrs. Field testified in part as follows: " Q. What were the various sources of information from which you got the bills of particulars? A. It may have been from facts in the file or from the client, or from the records in the office. Q. Was it ever from Mr. Eichner? A. I don't remember."

Although respondent gave her particulars in some cases, Mrs. Field did not know, before the referee, whether he did so in the Plastik cases. Before the referee her testimony is that she usually took the facts from the clients when they came into the office, and that if the client was there respondent would usually send them out to her for her to take the facts from them direct. In some cases written statements were received from the clients.

Confronted with the conflict in the testimony before the referee and that given in the ambulance chasing investigation, Mrs. Field testified that what she said in that investigation before Mr. Justice WASSERVOGEL was not true. The explanation given before the referee that she feared the efforts of her husband, with whom she was having domestic difficulties, is not very convincing. Referring to Mrs. Field, the referee said: " Her loyalty to her former employer was so intense that she did not balk at perjury."

Mrs. Field's testimony is that she made use of fictitious addresses for plaintiffs within the limits of the Second District pursuant to instructions from respondent.

A reading of the record in this case establishes respondent's guilt. The proximity of dates and the allegations of the bills of particulars destroy the possibility that some of the " accidents " could have happened. With apparent earnestness it is urged in the brief for respondent, " * * * the record is barren of the slightest shred of evidence or an inference or surmise that the accidents had not occurred and that the respondent knew that they had not occurred." So far as certain of the personal injury claims are concerned, we are convinced that the " accidents " could not have occurred, and did not in fact occur.

As to respondent's defense, the referee said: " I am constrained to reject the defense of the respondent. * * * In my opinion it is beyond the realm of probability that the respondent was unaware of the nature of the Plastik actions and that he never had any knowledge or even suspicion of his client's fraud. Upon the respondent's own testimony, he either knew what was going on or deliberately closed his eyes to it. His attempted exoneration through ignorance is completely shattered upon examination of some of the testimony which casts a baneful shadow upon the respondent's activities."

In this, we concur.

The testimony in the Salant matter, by Louis Salant, is that he is a taxicab driver; on March 12, 1927, he was discharging a passenger from his taxicab on Flatbush avenue, between Lafayette and Fulton streets, Brooklyn, when a truck of the United Cigar Stores Company came up from behind, struck his taxicab on the left side at the rear, and smashed the rear fender. The damage to the fender was repaired at a cost of ten dollars or twelve dollars. As the result of solicitation on the part of a man named Weinstein, suit was brought by respondent on behalf of Salant, in the Second District Municipal Court, Borough of Manhattan, Salant's address being given as 175 Allen street, which was fictitious; the unverified complaint alleged that Salant had suffered various serious injuries and that the damage to his taxicab amounted to the sum of $175. An unverified bill of particulars set out the damage and personal injuries in great detail. Salant claims he did not know suit had been brought until he received a letter from respondent to call at his office for a physical examination. A second letter was necessary before Salant called at respondent's office and told him exactly how the accident occurred and informed respondent that he did not want to be examined by a physician because he had not been hurt. This was in August, 1927. On September 10, 1927, Weinstein, who solicited the case, called on Salant and told him to appear in the Second District Court on Monday, the twelfth of September; Salant at the same time received a letter from respondent directing him to appear in court on that day. Salant was met in court by respondent's clerk, Goodstein, who asked about the facts. Salant told Goodstein the facts, whereupon Goodstein instructed him to say that he was hurt and sustained lacerations and contusions, that he was sick a number of weeks in bed, and that he consulted a doctor; Goodstein suggested the name of Dr. Shulman and told him to say that Dr. Shulman treated him. Goodstein coached him what to say as to the injuries, and as to the amount of money he spent for doctor and medicines, and for repairing his automobile and the number of days he was disabled. Salant claims that he protested against testifying as urged and Goodstein derided him for being a fool. While this was taking place the case was called and Salant took the stand. Respondent tried the case. Salant testified as Goodstein urged him to. The jury returned a verdict for $300 on the personal injury claim. The claim for property damage was waived on the trial. The day following the trial representatives of the insurance company which had insured the defendant obtained a confession from Salant.

Respondent admitted that Salant called on him on one occasion

before the trial, and that he then sent him to Miss Katz, and never discussed with Salant the facts of his case. Miss Katz said she never met Salant. She typed the bill of particulars as well as the complaint, and got the material either from respondent himself or prepared them under his instructions from material in the folder. Oscar Goodstein, who was respondent's clerk at the time, testified he met Salant in the court on the day of the trial, but, he testified: "I had no conversation with him concerning anything in relation to the case."

Before Mr. Justice WASSERVOGEL respondent testified that at the time of the trial Goodstein told him, respondent, what Salant would testify to. Before the referee his testimony was not so definite on that point; he was asked: "Q. Now, did Goodstein tell you the facts with regard to the Salant case before you began the trial of it?" And he answered: "I have not any independent recollection of it, but I assume he did. He must have told me." Respondent testified that Goodstein must have told him the facts in regard to the happening of the accident, but "The rest I find on the bill of particulars, and I don't need anything from him." Goodstein's testimony is that he told nothing to respondent about the Salant case except possibly that Salant was in the court room. In any event Salant testified as he was expected to. A reference to the record of the trial in the Salant case discloses that, before resting, respondent made the following request: "Will your Honor give me the privilege of calling the doctor, as soon as he comes in." Respondent claimed before the referee that Salant testified at the trial that the doctor would be there. The record discloses no such testimony. Salant, before the referee, testified that respondent said at the trial that the doctor was on his way to court to testify. Salant's recollection on this point is more reliable than respondent's. But the feature of this episode that interests us is that this was a covering up of the failure to produce a doctor on the question of the injuries.

There are a number of things in connection with respondent's testimony concerning the Salant case which are not so clear as to be above suspicion; he admits the request by the insurance company for a physical examination, and a call from Salant following a letter from his office to call for an examination, but no examination was had. He admits that Salant called following Salant's confession to the insurance company's representative, and claims that on that occasion he turned over to Salant his file of the case, and told Salant he would not collect the judgment and did not want to have anything more to do with him. Respondent then called upon the judge before whom the case had been tried, told

him the situation, and asked his advice; the judge advised him not to issue execution and let the matter stand. Later respondent called the insurance company and told its representative he had learned he had been imposed upon and that he was not going to collect the judgment. A month later, however, there is testimony of a change of front, and respondent called the insurance company and threatened to issue execution unless the judgment was paid. This threat is neither admitted nor denied by respondent. It is inconsistent with a desire to be free of any connection with the matter. It is of interest to note that respondent made no effort to cancel or vacate the judgment which had been fraudulently obtained. Then there is respondent's testimony before Mr. Justice WASSERVOGEL that he had destroyed his file in the case. Confronted with this testimony respondent, before the referee, attempted to contend that to his mind surrender of the file to Salant was equivalent to destruction. Goodstein testified to a desire to appear before Mr. Justice WASSERVOGEL to explain his connection with the Salant case; this desire was quieted by respondent, who also concealed from the investigators Goodstein's continued connection with his office.

On the Salant charge the learned referee said: " Suspicious circumstances are not sufficient to hold the respondent guilty of the heinous offense charged by the petitioners. I cannot believe that the respondent carried his hardihood so far as to entrust a young man of Goodstein's character with being a go-between in a criminal conspiracy and to actually go to trial in a so-called ' framed ' case. * * * A criminally disposed mind, weighing the chances of discovery may not shrink from making a false claim with the expectation of a settlement while refraining from bringing such claim into court and making a record thereof upon a trial."

We are constrained to disagree with the conclusion of the referee on the Salant charge. The record justifies the inference that the failure to have his client submit to a physical examination precluded the settlement of the claim and forced respondent to either go to trial or discontinue the action. Lack of a " ready " garage man led to the withdrawal of the property damage claim. The misleading request for permission to have the physician testify quieted any suspicion attaching to the non-production of a physician.

The record shows that respondent unhesitatingly for his own convenience disregarded the statutory provision regarding the proper district in which suit is to be brought in the Municipal Court, and deceived the court, as well as his opponent, by having fictitious addresses assigned to plaintiffs; that he knew that many of the Plastik claims were fraudulent and without basis, and he

unhesitatingly participated in the presentation and settlement of such fraudulent claims; that he prosecuted to judgment the Salant claim with full knowledge that no personal injuries had been sustained, allowed his client to commit perjury and even attempted to force payment of the judgment by threat of execution.

Respondent has demonstrated himself to be unfit to remain a member of an honorable profession and he should be disbarred.

FINCH, McAVOY, MARTIN and O'MALLEY, JJ., concur.

Respondent disbarred.